

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-20-2007

# Taylor v. Horn

Precedential or Non-Precedential: Precedential

Docket No. 04-9016

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Taylor v. Horn" (2007). *2007 Decisions.* Paper 330.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/330

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 04-9016

---

PAUL GAMBOA TAYLOR,

<u>Appellant</u>

v.

MARTIN HORN, Commissioner,
Pennsylvania Department of Corrections;
GREGORY R. WHITE, Superintendent
of SCI Pittsburgh; JOSEPH MAZURKIEWICZ,
Superintendent of SCI Rockview

---

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 04-cv-00553)
District Judge: Hon. James F. McClure, Jr.

---

Argued October 18, 2006

BEFORE: BARRY, FUENTES, and ROTH, <u>Circuit Judges</u>

(Filed September 20, 2007)

Matthew C. Lawry, Esq. (Argued)
Michael Wiseman
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West

Independence Square West
Philadelphia, PA 19106

Counsel for Paul Gamboa Taylor

Stuart Suss, Esq. (Argued)
Office of the Pennsylvania Attorney General
Appeals and Legal Services Section
2490 Boulevard of the Generals
Norristown, PA 19403

Counsel for Martin Horn, Commissioner,
Pennsylvania Department of Corrections;
Gregory White, Superintendent, State
Correctional Institution at Pittsburgh; and
Joseph P. Mazurkiewicz, Superintendent,
State Correctional Institution at Rockview

---

OPINION

---

FUENTES, Circuit Judge.

Paul Gamboa-Taylor ("Taylor") is a Pennsylvania inmate sentenced to death by a Pennsylvania state court for murdering his wife, Valerie, their two children, and his mother-in-law's child. He is also serving a life sentence for murdering his mother-in-law, Donna Barshinger. On federal habeas review, pursuant to 28 U.S.C. § 2254, the District Court concluded that none of Taylor's guilt or penalty-phase claims merited a writ of habeas corpus.[1] We agree with the District Court, and will affirm.

**I. Background And Procedural History**

---

[1] The Court granted a certificate of appealability as to all procedural and merits issues.

2

Taylor pleaded guilty to five murders on December 19, 1991. A hearing was conducted on January 10, 1992 to determine Taylor's degree of guilt and penalty. At this hearing, Taylor was found guilty of five counts of murder in the first degree by the Honorable John H. Chronister, Judge of the Court of Common Pleas of York County, Pennsylvania. Judge Chronister also determined the sentence, without objection from Taylor, which was imposed on January 23, 1992.

## A.

The murders took place on the evening of May 18, 1991. Under the influence of alcohol and cocaine, Taylor, who had no apparent prior history of domestic violence, hammered the skull of his mother-in-law and slit her throat with a knife. He then hammered the skulls of her two-year-old son Lance, and his own children, four-year-old Paul and two-year-old Jasmine. When his wife Valerie returned home twelve hours later, he also hammered her skull until she died. Taylor did not harm his five-month-old daughter, Rachelle, who was present during the killings. After killing his wife, Taylor attempted suicide by slashing his wrists with a hacksaw and stabbing himself in the abdomen. He then called 911 (because he was worried about Rachelle) before trying to electrocute himself in the bathtub with a hair dryer. When the police arrived, they found him alive in the bathtub and took him to York Hospital.

At the hospital Taylor made incriminating statements after the police questioned him about the killings without advising him of his right to counsel or to remain silent. Doctors stabilized Taylor physically and on May 22, 1991, transferred him to York Hospital's psychiatric inpatient unit. There, Mohamed I. Elyan, M.D., Taylor's treating physician, recorded Taylor's account of what happened the night of the murders in his hospital records. When Dr. Elyan concluded that Taylor was psychiatrically stabilized, on May 24, 1991, he discharged Taylor to the state's custody.

Attorney Robert Bruce Evanick, Chief Public Defender, was appointed to represent Taylor. Evanick prepared a suppression

motion, seeking to exclude the statements that Taylor made to police at the hospital. Taylor, however, wrote a letter of confession to the police, dated June 15, 1991, which states the following:

> On May 18, 1991, I, Paul G. Taylor, came home, went to the third floor, and to check on the kids. Jasmine was sleeping with Donna. I picked her up and put her in my bed, and no voice made me do it. I did it. Paul G. Taylor, on my own. I was so mad or bad about me to turn back to drugs, and my wife didn't care no more that I wasn't going to leave my family for no one. If I couldn't have my kids, no one will. So I went downstairs and got the ball-peen hammer and killed Donna, Lance, Jasmine and Paul with it. After I dropped the hammer, I ran downstairs and washed my hands and went outside and walked around and cried. And I knew what I had done. It was my turn and my wife's turn to die. I came back, went to the third floor, and covered them up. The baby was asleep. Rachelle and I went downstairs. And I called about 5:00 or 6:00 a.m. I called Tina Markle to see if she was there. The phone rang and Tina picked it up and I said, is Val there. She said, yes. But she never got on the phone, and the phone went dead. I called back, but I got a busy sound, and tried a half hour later, and got the same thing. Val called back around 11:30 and said she be home around 12, or 12:30, and she hung up. When she got home she did not look or say anything but went to the dining room, and said, I'm going out tonight. And I killed her with the hammer, too, and went outside and said to Tina, she'll see you tonight, and she went. I carried my wife up the stairs and laid her in bed with my daughter, and went downstairs and got a hacksaw and a knife, and went back upstairs to kill myself. That's what happened to my family. I don't want mercy from the Court. I want the maximum sentence. God said that this was the truth. Amen. P.S., I'm not a sick man. I'm a man that went over and came back. P.S. It was out

4

of love that no one was going to take them away, my
wife and my kids. Truly sorry, Mr. Paul G. Taylor.

(App. at 238-39.)

Before Taylor's plea hearing, two experts—Edward J.
Briercheck, M.S., a licensed psychologist, and Robert L. Sadoff,
M.D., a psychiatrist—evaluated Taylor and opined that he was
competent to participate in legal proceedings. Moreover, Mr.
Briercheck concluded that Taylor "was capable of formulating
intent" at the time of the murders and Dr. Sadoff found that Taylor
would not be able to prove an insanity defense. (App. at 317.)

At Taylor's guilty-plea hearing on December 19, 1991,
about seven months after the murders, defense counsel reported to
the trial judge that Taylor had directed him "not to contact any
witnesses or to call any medical personnel who have interviewed
and talked with him. He understands that there are statutory
aggravating circumstances and that the likely result will be
imposition of the death penalty." (App. at 137.) Taylor agreed
with counsel's statement in a colloquy on the record, after which
the court accepted his plea.

Twenty-two days later, at Taylor's degree-of-guilt and
penalty hearing, the trial judge granted Taylor's suppression
motion, ruling that the hospital statements were unlawfully
obtained. The court next asked Taylor if he wished to let his guilty
plea stand, and Taylor answered affirmatively.

The Commonwealth presented several witnesses' testimony,
including police and pathologists. Defense counsel presented no
evidence, and made no argument on Taylor's behalf. The trial
judge concluded that all five murders were intentional and thus in
the first degree.

The penalty phase commenced immediately, and the court
asked Taylor whether he wanted to present any mitigating
evidence. Taylor declined. Nevertheless, the District Attorney, H.
Stanley Rebert, stated that, as an officer of the court, he felt obliged
to mention that Taylor could claim the mitigating circumstance set

5

forth in 42 Pa. Cons. Stat. Ann. § 9711(e)(1) because he had no significant history of prior criminal convictions.[2]

The trial judge next heard argument on the aggravating circumstances, and the Commonwealth conceded that none applied to the murder of Taylor's mother-in-law. Taylor murdered the three children and Valerie after his mother-in-law, however, which satisfied 42 Pa. Cons. Stat. Ann. § 9711(d)(11) (requiring that a defendant be convicted of another murder committed either before or at the time of the offense at issue). And the three children were under the age of twelve, which satisfied 42 Pa. Cons. Stat. Ann. § 9711(d)(16) (requiring that the victim be a child under the age of twelve).

As the hearing came to an end, Taylor's counsel added:

> Your Honor, just so we're clear for the record, the only other additional mitigating factor is the Defendant's remorse. That has been passed on by the Supreme Court and found to be a legitimate mitigating factor. Whether or not you conclude from his letter [of June 15, 1991] that he is genuinely sorry for what occurred, of course, is your decision, but there is certainly evidence to support it of record.

(App. at 247-48.)

The judge sentenced Taylor to life in prison for his mother-in-law's murder, after finding that there were no aggravating circumstances and at least one mitigating circumstance (no prior criminal record). With respect to the three children, the court found that both aggravating circumstances had been proved beyond a reasonable doubt, and that there were two mitigating circumstances: no prior criminal record and genuine remorse. The court concluded that the aggravating circumstances outweighed the mitigating ones, and imposed three death sentences for the childrens' murders. For Valerie's murder, only one aggravating

---

[2] Taylor's only prior conviction was for disorderly conduct.

6

circumstance had been proven since she was an adult, and there were two mitigating circumstances: no prior record and remorse. Nevertheless, the judge found that the single aggravating circumstance outweighed the two mitigating circumstances and imposed a death sentence. The court explained:

> The Court draws this conclusion on the fact that there were multiple homicides which occurred. Also in the fact that a substantial period of time passed after the first four victims were killed, and the wife, Valerie Taylor came home, so that this lying in wait, and this further opportunity to plan and premeditate the situation creates an additional weight to the aggravating circumstance in the Court's mind.

(App. at 285.)

The court advised Taylor that post-trial motions were due on January 23, 1992, the date of formal sentencing, and advised him of his automatic right to appeal. At formal sentencing, on January 23, 1992, defense counsel explained: "I spoke with Paul last week. He indicated that he did not want any motions filed in his behalf and I'm not sure there are any that could have been filed. So he's essentially forfeited that potential area of review." (App. at 288.) The court then asked Taylor whether he had anything to say before sentencing. He did not, and the court imposed four death sentences and one life sentence.

**B.**

Death sentences are subject to automatic review by the Supreme Court of Pennsylvania. 42 Pa. Cons. Stat. Ann. § 9711(h). On May 4, 1993, Taylor's counsel told the Court that Taylor wished no action to be taken on his behalf. The Court instructed counsel to obtain an affidavit from Taylor confirming this intention, and counsel supplied Taylor with an affidavit for his signature. Taylor declined to sign the affidavit in a handwritten note to counsel, dated May 6, 1993. The note said:

> The affidavit you send me on May 6, 1993 to sign

7

and get notary is a suicide form to say I Paul Gamboa Taylor give them the right to kill me; they the court found me guilt[y] now they or you want me to commit suicide in writing too. I do not understand the law, but by the Grace of God I will not sign over my life in a affidavit you have send.

(App. at 340.) Thereafter, Taylor executed an affidavit authorizing counsel to withdraw his guilty plea, and on May 20, 1993, counsel filed a petition with the Court requesting a remand to afford Taylor the opportunity to do so. The Court denied the petition for remand, without explanation, on July 21, 1993.

On December 9, 1993, the Court sustained Taylor's murder convictions and affirmed the judgment of sentence. Commonwealth v. Gamboa-Taylor, 634 A.2d 1106 (Pa. 1993) (hereinafter "Taylor I"). Because no issues had been preserved for review, the Court reviewed only those issues required by statute, and held: the evidence was sufficient to support convictions for first degree murder;[3] there was no evidence that the sentences of death were the product of passion, prejudice or any other arbitrary factor; and the sentences of death were not excessive or

---

[3] With respect to whether the evidence was sufficient, the court stated:

At the degree of guilt hearing, the autopsy reports were admitted into evidence to establish that the victims' deaths were homicides. Valerie's friend, Tina Smith, was able to place Appellant at the murder scene, and the court accepted into evidence the hammer and Appellant's confession as evidence to establish that the murders were intentional killings. From this wealth of evidence, there is no doubt in our minds that the five first degree murder convictions were sustainable and that overwhelming evidence can support them.

Id. at 1108.

8

disproportionate.  Id. at 1108-09.  The Court did not mention Taylor's desire to withdraw his guilty plea.

## C.

On January 13, 1997, Taylor filed a timely pro se petition for post-conviction relief under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541-46. Attorney J. Richard Robinson, who was appointed as post-conviction counsel, filed a supplemental petition (the "first PCRA petition"), including the following pertinent claims:

> 1.  Trial counsel was ineffective in failing to introduce evidence of Petitioner's drug use for purposes of mitigating circumstances at the penalty phase.
>
> 2.  Trial counsel was ineffective in failing to interview witnesses identified in discovery who may have provided exculpatory evidence for Petitioner.
>
> 3.  Trial counsel was ineffective in failing to raise or pursue the defense of diminished capacity.
> . . .
> 6.  Trial counsel was ineffective in failing to call family members and friends as character witnesses at trial.

(App. at 351-52.)  The first PCRA petition also contained a list of twenty-two potential witnesses, including family members and friends.  The petition was assigned to Judge Chronister, who had been Taylor's trial judge.  The judge held a hearing on June 24, 1997, at which Taylor presented no evidence besides his own testimony.  Trial counsel, then working in New Orleans, gave testimony via telephone.

Judge Chronister denied the post-conviction petition, finding that Taylor had instructed counsel "not to present testimony, that [Taylor] had discussed the possibility of having testimony by various friends, associates, employers, coworkers

9

with Mr. Evanick and elected not to call them and, in fact, [Taylor] made the phone calls to tell those witnesses not to come in." (App. at 277-78.) Taylor appealed the denial of post-conviction relief, but on August 20, 1998, Judge Chronister's decision was affirmed in Commonwealth. v. Taylor, 718 A.2d 743 (Pa. 1998) (hereinafter "Taylor II").

**D.**

On September 3, 1998, Taylor, represented by current counsel, the Defender Association of Philadelphia, initiated proceedings in the United States District Court for the Middle District of Pennsylvania by filing motions to stay the execution, appoint counsel, and proceed *in forma pauperis*. After receiving extensions of time, Taylor filed a petition for writ of habeas corpus on January 5, 1999 raising numerous claims—some of them plainly new, some of them more comprehensive versions of what had been raised in his first PCRA petition. Among other things, Taylor claimed that trial counsel's performance was constitutionally deficient because he failed to adequately investigate Taylor's family background and mental health issues, and failed to present a defense to first-degree murder or, at the penalty phase, evidence of mitigating circumstances.

On February 5, 1999, Taylor filed a second PCRA petition in the York County Court of Common Pleas in order to exhaust the claims in his federal petition that were new. Taylor's second PCRA petition was also assigned to Judge Chronister. Taylor alleged ineffective assistance of post-conviction counsel (counsel for his first PCRA petition) and submitted new evidence, including affidavits from his siblings and family friends, and affidavits from two new experts, Richard G. Dudley, Jr., M.D., and Gillian Blair, Ph.D. The petition also included updated affidavits from Mr. Briercheck and Dr. Sadoff.

On March 9, 1999, the District Court dismissed the "mixed" habeas petition without prejudice, for failure to exhaust state remedies. See Rose v. Lundy, 455 U.S. 509, 510, 522 (1982). And, in the meantime, Judge Chronister denied Taylor's second PCRA petition as untimely.

10

Taylor appealed to the Supreme Court of Pennsylvania contending that the after-discovered evidence exception to the state's post-conviction one-year limitation period, 42 Pa. Cons. Stat. Ann. § 9545(b)(1)(ii), applied. He included affidavits from Drs. Dudley, Blair, Sadoff, and Mr. Briercheck, and he argued that the first post-conviction counsel provided ineffective assistance by failing to appreciate the significance of his diminished mental state, as revealed in this after-acquired evidence. On June 19, 2000, the Court affirmed the untimeliness ruling. Commonwealth. v. Gamboa-Taylor, 753 A.2d 780 (Pa. 2000) (hereinafter "Taylor III"). The Court reasoned that an allegation of ineffective assistance of post-conviction counsel does not excuse a failure to comply with the PCRA's time limitation, id. at 785, and that all of the facts regarding Taylor's mental state, if not known, were discoverable by the exercise of due diligence before his proceedings, id. at 787.

On August 11, 2000, proceedings in the District Court resumed when Taylor re-filed his habeas petition. On July 22, 2004, the District Court denied the habeas petition on the merits.[4] Taylor appealed.[5] Taylor's habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214.

Taylor pursued seventeen claims before the District Court, and has consolidated them for the purposes of this appeal essentially as follows:

> Claim 1: The trial court failed to hold a competency hearing despite indicia that Taylor was incompetent.

> Claim 2: Taylor's due process rights were denied when he was tried while incompetent, and the



[4] The District Court had jurisdiction under 28 U.S.C. § 2254.

[5] We have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253.

11

District Court erred when it refused to hold an evidentiary hearing to consider his after-acquired evidence that he was not actually competent at the time of his proceedings.

Claim 3: Trial counsel was ineffective for failing to investigate, prepare, and present evidence of Taylor's incompetence.

Claim 4: Taylor's guilty plea and waivers of other rights were not knowing, intelligent, and voluntary.

Claim 5: Trial counsel was ineffective for failing to ensure that any waiver by Taylor was knowing, intelligent, and voluntary.

Claim 6: Taylor never waived his right to have his sentence determined by a jury, and counsel was ineffective for failing to object to the invalid waiver.

Claim 7: Trial counsel failed to investigate, present, and argue mitigating evidence, and his deficient performance prejudiced the defense.

Claim 8: Taylor did not waive his right to present mitigating evidence and any purported waiver was invalid because he was not adequately informed of his rights.

Claim 9: Trial counsel was ineffective for failing to investigate, develop, and present the defense of diminished capacity.

Claim 10: Trial counsel was ineffective for failing to investigate, develop and present the defense of voluntary intoxication.

12

Claim 11: Taylor was denied effective assistance of counsel on direct appeal to the state supreme court.

Before reaching the merits of Taylor's claims we first address the threshold issues of timeliness, exhaustion, and procedural default.

## II. Timeliness, Exhaustion, and Procedural Default

### A. Timeliness

The Commonwealth argues that the set of claims Taylor raised for the first time in his August 2000 federal habeas petition is barred by the statute of limitations set forth in 28 U.S.C. § 2244(d)(1), which provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of

13

the claim or claims presented could have been discovered through the exercise of due diligence.

Because Taylor's conviction became final before AEDPA was passed, the one-year limitation period began to run on its passage date, April 24, 1996. Burns v. Morton, 134 F.3d 109, 111 (3d Cir. 1998); Miller v. N.J. State Dep't of Corrs., 145 F.3d 616, 617 (3d Cir. 1998).

On January 13, 1997, about eight months after the statute of limitations began to run, Taylor filed his first PCRA petition. We toll the limitations period while that petition was pending, pursuant to 28 U.S.C. § 2244(d)(2); thus it did not begin to run again until the Supreme Court of Pennsylvania affirmed the denial of the petition, on August 20, 1998.

An additional two weeks elapsed before Taylor filed his motions for a stay of execution, appointment of counsel, and *in forma pauperis* status in federal court, on September 3, 1998. Then, on January 5, 1999, he filed his first, timely habeas petition. However, on March 9, 1999, the District Court dismissed the "mixed" petition, without prejudice, for failure to exhaust state remedies. See Rose, 455 U.S. 509. The Court declined to stay the matter pending exhaustion, but noted that Taylor's filing of an exhausted petition would likely relate back to his January 1999 petition, under Federal Rule of Civil Procedure 15(c).

By the time Taylor filed his second petition before the District Court, on August 11, 2000, his time to file had run out. The Court had to reconsider its prediction that the revised petition would relate back because the law changed while Taylor had been pursuing his second PCRA petition. In the interim, we issued Jones v. Morton, 195 F.3d 153 (3d Cir. 1999), which held that once a petition is dismissed for failure to exhaust, a new petition cannot relate back to the dismissed petition. In light of Jones, the District Court correctly determined that Taylor's August 2000 petition could not relate back to his January 1999 petition. However, the Court decided to equitably toll the statute because it would have granted his request for a stay initially, had it the benefit of our

14

subsequent decisions in <u>Jones</u> and <u>Crews v. Horn</u>, 360 F.3d 146, 154 (3d Cir. 2004), in which we permitted a stay when a dismissal would jeopardize timeliness.  The Court also found that Taylor had pursued his claims diligently.

The Commonwealth argues that the District Court erred because § 2244(d)(1)'s one-year requirement is not subject to equitable tolling.  In <u>Miller</u>, however, we explained that § 2244(d)(1) is a statute of limitations, subject to equitable tolling, not a jurisdictional rule.  145 F.3d at 617; <u>see also</u> <u>Day v. McDonough</u>, 547 U.S. 198, 205 (2006) (holding that § 2244's one-year time limitation is not jurisdictional).

Section 2244(d)'s one-year limitation may be tolled, among other reasons, if "the plaintiff has in some extraordinary way been prevented from asserting his rights."  <u>Fahy v. Horn</u>, 240 F.3d 239, 244 (3d Cir. 2001).  The Commonwealth concedes that if § 2244(d)(1)'s time limitation may be tolled, then the factual circumstances in this case warrant tolling.  Commonwealth Br. at 21.  Our review confirms that Taylor has pursued his claims diligently, and that the District Court had assured Taylor "that the claims presented in [his timely] petition could later be reasserted in an 'amended' petition" that would "relat[e] back" to his timely petition.[6]  <u>See</u> Dist. Ct. Op. at 9.  Thus, in these circumstances, we agree with the Commonwealth, Taylor, and the District Court that equitable tolling is warranted.  We will therefore affirm the District Court's decision to toll the statute of limitations.  Taylor's claim is therefore timely.

## B.  Exhaustion and Procedural Default

The Commonwealth concedes that the claims Taylor raised in his first PCRA petition have been exhausted under 28 U.S.C. §

---

[6]  "[W]here, as here, the relevant facts are not disputed, a District Court's decision on the question whether a case is sufficiently extraordinary to justify equitable tolling should be reviewed de novo."  <u>Brinson v. Vaughn</u>, 398 F.3d 225, 231 (3d Cir. 2005) (internal quotation marks omitted).

2254(b)(1)(A). It argues, however, that the claims Taylor raised for the first time in his second PCRA petition have not been exhausted and are procedurally defaulted because the state courts dismissed his petition as untimely.

Section 2254(b)(1)(A) provides that an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that "the applicant has exhausted the remedies available in the courts of the State." "To satisfy the exhaustion requirement, the petitioner must fairly present all federal claims to the highest state court before bringing them in federal court." Stevens v. Del. Corr. Ctr., 295 F.3d 361, 369 (3d Cir. 2002) (internal quotation marks omitted). Here, because we will deny all of Taylor's claims on the merits, we need not address exhaustion. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

We will address procedural default, however, even with respect to the claims we will deny. A habeas claim has been procedurally defaulted when "a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman v. Thompson, 501 U.S. 722, 730 (1991). For a federal habeas claim to be barred by procedural default, however, the state rule must have been announced prior to its application in the petitioner's case and must have been "firmly established and regularly followed." Ford v. Georgia, 498 U.S. 411, 423-24 (1991). Whether the rule was firmly established and regularly followed is determined as of the date the default occurred, not the date the state court relied on it, Doctor v. Walters, 96 F.3d 675, 684 (3d Cir. 1996), because a petitioner is entitled to notice of how to present a claim in state court, Ford, 498 U.S. at 423-424.

Here, the state courts dismissed Taylor's second PCRA petition as untimely pursuant to Pennsylvania's one-year PCRA

16

statute of limitations, 42 Pa. Cons. Stat. Ann. § 9545(b)(1).[7]  We agree with the District Court that Taylor's default occurred on March 9, 1995, when Taylor's time to file a second petition expired, and we have held that § 9545(b)(1) was not firmly established or regularly applied until November 23, 1998, at the earliest, when the Supreme Court of Pennsylvania decided Commonwealth v. Albrecht, 720 A.2d 693, 700 (Pa. 1998).  See Bronshtein v. Horn 404 F.3d 700, 708-09 (3d Cir. 2005) (recognizing that petitioner, whose second PCRA petition was untimely under § 9545(b)(1), had not defaulted federal review because Pennsylvania previously applied a "relaxed waiver" rule, under which a claim of constitutional error in a capital case would not be waived by a failure to preserve it).[8]  Thus, we agree with the District Court's determination that Taylor's claims raised for the first time in his second PCRA petition are not barred by procedural default.

### III.  Applicable Legal Principles

The parties agree that AEDPA governs federal court review of Taylor's habeas action.  We review *de novo* whether the District Court appropriately applied AEDPA's standards of review.  Johnson v. Carroll, 369 F.3d 253, 257 (3d Cir. 2004).  The District Court's denial of an evidentiary hearing is reviewed for abuse of discretion.  See Schriro v. Landrigan, 127 S. Ct. 1933, 1940, 1944 (2007); Hakeem v. Beyer, 990 F.2d 750, 758 (3d Cir. 1993).

---

[7] The grace period afforded *first* state petitions by the 1995 amendments to the PCRA, which permitted petitions to be filed by January 16, 1997, did not apply to Taylor's second petition.  See Taylor III, 753 A.2d at 782 n.2.

[8]  On December 21, 1998, the Supreme Court of Pennsylvania held in Commonwealth v. Peterkin, 722 A.2d 638 (Pa. 1998), that the time bar applies to capital cases and is not superseded by the relaxed waiver rule.  In Commonwealth v. Banks, 726 A.2d 374 (Pa. 1999) the Court held that the time bar is jurisdictional.  The Commonwealth's only argument in support of its procedural default claim is that we should overrule Bronshtein en banc.

## A. Standards of Review Under AEDPA

AEDPA requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations on the merits. Specifically, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is "contrary to" Supreme Court precedent if the state court "arrives at a conclusion opposite to that reached" by the Court on a question of law, or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that of the Court. Williams v. Taylor, 529 U.S. 362, 405 (2000). An "unreasonable application" of Supreme Court precedent occurs: (1) "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;" or (2) if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

If, on the other hand, "the state court has not reached the

merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA and explained in Williams do not apply." Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001). "In such an instance, the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." Id.

Whether or not the state courts reached the merits of a claim, § 2254(e)(1) requires that "a determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence." See id. Although it would appear that there is "little material difference between a reasonableness determination and a presumption of correctness as they express the same fundamental principle of deference to state court findings," we have explained that, in fact,

> the language of § 2254(d)(2) and § 2254(e)(1) implies an important distinction: § 2254(d)(2)'s reasonableness determination turns on a consideration of the totality of the "evidence presented in the state-court proceeding," while § 2254(e)(1) contemplates a challenge to the state court's individual factual determinations, including a challenge based wholly or in part on evidence outside the state trial record.

Lambert v. Blackwell, 387 F.3d 210, 235 (3d Cir. 2004).

In addition, AEDPA prohibits district courts, except in certain limited circumstances, from holding an evidentiary hearing on a federal habeas claim "[i]f the applicant has failed to develop the factual basis of [the] claim in State court proceedings." § 2254(e)(2). However, even if an evidentiary hearing is not prohibited under § 2254(e)(2), a petitioner is not necessarily entitled to one: "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."

19

<u>Landrigan</u>, 127 S. Ct. at 1940. Furthermore, to the extent that "the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." <u>Id.</u> at 1940.

## B. Ineffective Assistance of Counsel

Sixth Amendment claims of ineffective assistance of counsel are governed by <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), which "qualifies as clearly established Federal law, as determined by the Supreme Court of the United States.'"[9] <u>Williams</u>, 529 U.S. at 391 (internal quotation marks omitted). To prevail, a defendant must show that counsel's performance was deficient, and that this prejudiced the defense. <u>Strickland</u>, 466 U.S. at 687. Trial counsel's representation must fail to satisfy an objective standard of reasonableness, considering all the circumstances. <u>Id.</u> at 688. Courts must assess the reasonableness of counsel's conduct on the facts of the particular case, and as of the time of counsel's conduct. <u>Id.</u> at 690. Counsel's strategic choices made after full investigation are "virtually unchallengeable," but choices made after limited investigation are reasonable only to the extent that the limited investigation itself was reasonable. <u>Id.</u> at 690-91. Moreover, courts may look to the defendant's statements or actions in determining the reasonableness of counsel's conduct. <u>Id.</u> at 691. <u>Strickland</u>'s prejudice prong requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.

## IV. Competency Claims (Claims 1, 2, and 3)

---

[9] We note that the District Court properly determined that there was no constructive denial of counsel in Taylor's case, and thus no basis for a presumption of prejudice under <u>Cronic v. United States</u>, 466 U.S. 648, 659 (1984). <u>See</u> <u>Bell v. Cone</u>, 535 U.S. 685, 696-98 (2002) (rejecting broad application of <u>Cronic</u>). We reject Taylor's arguments to the contrary.

Taylor argues that the proceedings leading to his conviction and death sentence violated three of his constitutional rights relating to his competency to stand trial: (Claim 1) his due process right to a competency hearing; (Claim 2) his due process right not be tried while incompetent; and (Claim 3) his Sixth Amendment right to effective assistance of counsel with respect to competency issues. He also seeks an evidentiary hearing before the District Court to present newly-acquired evidence that he was not competent at the time of his proceedings.

## A. Federal Competency Standards

The foundation of these competency claims is the well-established due process right to not to be tried, or plead guilty, while incompetent. See Drope v. Missouri, 420 U.S. 162, 171-72 (1975); Pate v. Robinson, 383 U.S. 375, 385 (1966); Godinez v. Moran, 509 U.S. 389, 399-400 (1993) (holding that standards for competency to plead guilty and to stand trial are the same).

The Supreme Court set the basic standard for competency in Dusky v. United States, 362 U.S. 402 (1960): To be competent to plead guilty or stand trial, a defendant must have a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and must possess "a rational as well as factual understanding of the proceedings against him." Id. at 402 (internal quotation marks omitted); see also Drope, 420 U.S. at 171 ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.").

## B. State Court Proceedings and Standards of Review

### 1.

At the outset, the state trial court "accept[ed] [Taylor's]

guilty plea finding it to be knowingly and voluntarily given."[10] (App. at 152.) In Godinez, the Supreme Court explained:

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced.

509 U.S. at 401 n.12 (citations omitted). If a defendant does not have the "ability" to understand the proceedings, it is impossible that he "actually does" understand them. It follows, then, that a finding of competence is a prerequisite to a determination that a plea is knowing and voluntary. Thus, the state trial court's determination that Taylor's plea was knowing and voluntary, included an implied finding that he was competent.[11]

---

[10] Taylor contends that his plea was not in fact "knowingly and voluntarily" given, see Taylor Br. at 46-56, but that argument is not relevant to our determination of whether there was a state court determination of competency on the merits. Taylor's argument is, however, appropriate in rebuttal to the presumption of correctness of the competency determination, and we address it in that context.

[11] See, e.g., United States v. Pressley, 602 F.2d 709, 711 (5th Cir. 1979) ("The court's finding that Pressley was competent to understand the proceedings at the time of his original plea, although a prerequisite to validity of the plea, does not end the inquiry. Such factors as whether . . . the original plea was knowing and voluntary . . . should be considered."); White v. Horn, 54 F. Supp. 2d 457, 466 (E.D. Pa. 1999) ("Even in the absence of an express finding of competence by the state courts, a defendant who alleges insanity in his habeas corpus petition may be presumed to be competent, since the trial court judge would not have otherwise allowed the trial to proceed."); cf. Whitmore v. Arkansas, 495 U.S. 149, 165 (1990) (suggesting that a litigant has not demonstrated

Sitting as the first PCRA court, Judge Chronister held an evidentiary hearing and made factual findings on (1) Taylor's competency during his proceedings and (2) effective assistance of counsel with respect to competence. Judge Chronister explicitly reaffirmed his implicit finding at the guilty plea hearing that Taylor was competent. The Judge also determined for the second time that Taylor had been competent to make decisions about his case, albeit affected by his remorse, and that counsel was not ineffective for entrusting Taylor with decisions about his case:

> There's nothing in the testimony today which would show that the Defendant was not capable of making those decisions or that there was any legal impediment which would have forced counsel not to submit the decision to the Defendant.
>
> We recognize that perhaps the Defendant's thinking at that time was colored by remorse. I don't think there's any question about that. His very actions of having counsel file for suppression, having the Court grant a suppression of a confession, and then the Defendant turning right around and sending a letter to the D.A. giving another confession to make sure that the conviction would occur makes it clear that the Defendant was acting out of remorse. But the Court does not find that to be a legal impediment.
>
> That remorse is a natural result and feeling of the circumstances of this particular death given the fact that it was the Defendant's family and his children who were involved, and the fact that the Defendant's mind may have been affected by the remorse is not an impediment to—legally to his

mental incapacity for purposes of "next friend" standing "where an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed").

23

making the decisions as to what—how the trial will proceed unless his mind is so clouded that he becomes confused or subject to a mental status that would make him unable to participate in the trial.

The Court was very careful to make sure that that was not the case, insisted upon the psychiatric evaluation prior to proceeding. The evaluation showed that the Defendant was capable of cooperating with counsel and making rational decisions, albeit affected by his remorse, and the Court finds that there's no legal impediment because of that.

(App. at 279-80.)

The Supreme Court of Pennsylvania affirmed this decision in Taylor II, recognizing that "[w]oven into Taylor's claim of ineffectiveness [of counsel] is the assertion that his mental state after the killings prevented him from making rational decisions, essentially rendering him incompetent. . . . In this case, Taylor's claim of incompetency is *completely unsupported in fact*." 718 A.2d at 745 (emphasis added). The Court reasoned, further:

[T]he PCRA court's determination that Taylor was competent in all matters of decision and strategy is supported by substantial evidence of record, including Taylor's own testimony, the testimony of his trial counsel, and the report of the court-appointed psychiatrist. Taylor's suggestion that stress and remorse associated with a capital case are such that he (and, by implication, others in his situation) are *per se* incompetent to make decisions of strategy does not comport with the well-established standard for determining mental competency . . . .

Id. at 745-46.

**2.**

24

Based on this record it is clear that the state courts addressed the merits of Taylor's claim that he was tried while incompetent (Claim 2), and received ineffective assistance of counsel in this regard (Claim 3); we will therefore review both claims under § 2254(d).[12] We will, however, review the trial court's decision not to hold a competency hearing (Claim 1) *de novo* because that claim was not addressed on the merits.

Moreover, regardless of whether a given claim was reached on the merits, competency is a state court factual finding that, if supported by the record, is presumed correct. See Thompson v. Keohane, 516 U.S. 99, 111 (1995) (citing Maggio v. Fulford, 462 U.S. 111, 118 (1983)); Demosthenes v. Baal, 495 U.S. 731, 735 (1990) (per curiam). Implicit factual findings are presumed correct under § 2254(e)(1) to the same extent as express factual findings. Campbell, 209 F.3d at 285-86. Thus, here, the state courts' implicit and explicit factual findings that Taylor was competent are presumed correct, unless Taylor can rebut "the presumption of correctness by clear and convincing evidence." See § 2254(e)(1); Appel, 250 F.3d at 210.

### C. The Merits of the Competency Claims

---

[12] Taylor correctly notes that the state trial court never conducted a formal competency hearing. But this does not mean that his competency was not addressed on the merits. See Jermyn v. Horn, 266 F.3d 257, 281 n.8 (3d Cir. 2001) (citing PCRA court's review of trial court's decision not to hold a competency hearing as an adjudication on the "merits"). We appreciate that if a competency hearing was not held when it ought to have been, in accordance with minimal federal standards of procedural due process, then no deference is due to a state court's competency determination. See Panetti v. Quarterman, 127 S. Ct. 2842, 2855-59 (2007). However, the corollary is also true: if due process did not require the trial court to convene a competency hearing, and the issue was otherwise addressed on the merits, then we afford the competency determination due deference under § 2254(d). See, e.g., Jermyn, 266 F.3d at 290-91.

**1.The Trial Court's Failure To Hold A Competency Hearing**
**(Claim 1)**

Taylor argues that the trial court's failure to hold a competency hearing despite indicia of his incompetence violated his procedural due process rights under Drope, 420 U.S. at 171-72 and Pate, 383 U.S. at 385. A trial court's failure to inquire into competency, *sua sponte*, where there is reason to doubt a defendant's competency, violates due process because it deprives the defendant of his right to a fair trial. Drope, 420 U.S. at 172; Pate, 383 U.S. at 385-86. But barring indicia of incompetence, due process does not require that a competency hearing be held. Godinez, 509 U.S. at 402 n.13.

The Supreme Court has not "prescribe[d] a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure" but it has explained:

> a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

Drope, 420 U.S. at 172, 180.

Taylor argues, first, that rather than hold a hearing the trial court erroneously relied wholly on Dr. Sadoff's conclusion that Taylor was competent to proceed. See Taylor Br. at 29-33. Although it would have been insufficient for the trial court to rest his entire competency determination on just one psychiatric report, see Pate, 383 U.S. at 383, that is not what happened here.

In addition to the Sadoff report, which concluded that Taylor was "mentally competent to proceed in that he does know the nature and consequences of his current legal situation and can work with counsel in preparing his defense," App at 326, the trial court had the benefit of its own observations and interactions with Taylor, as well as reports of counsel's observations and interactions with him. None of these indicated incompetency. The record shows that throughout the proceedings Taylor was able to engage with counsel and respond to the trial court's inquiries, and that trial counsel never expressed concern over Taylor's competency.[13] See Jermyn v. Horn, 266 F.3d 257, 294-97 (3d Cir. 2001); Demosthenes, 495 U.S. at 736-37.

The trial court also granted a continuance of the proceeedings when Taylor's counsel sought a psychological evaluation from Mr. Briercheck, to supplement the Sadoff report, prior to the guilty plea. After having received Mr. Briercheck's evaluation, which concluded that Taylor was "mentally competent to proceed with the legal aspects of his case,"[14] App. at 317, trial counsel did not seek a hearing on competency. The record does not disclose whether the court ever saw the Briercheck report, but we know that the court was aware counsel considered the issue of competence, had reviewed an expert opinion in addition to Dr. Sadoff's, and still did not raise the issue. See Jermyn, 266 F.3d at

---

[13] By contrast, the defendant in Drope "had difficulty in participating well," "had a difficult time relating," and "was markedly circumstantial and irrelevant in his speech." 420 U.S. at 165 n.1.

[14] Briercheck also wrote that Taylor was in complete contact with reality by September 1991, three months *before* he pleaded guilty, and Dr. Sadoff wrote in September 1991 that Taylor was without current evidence of a psychotic thought disorder, hallucinations or delusions, and was well-oriented, with unimpaired memory. Dr. Elyan, who treated Taylor immediately after the murders, concluded in his report that any cocaine-induced psychosis that Taylor may have experienced during the murders had remitted by the time he was discharged to the jail, which was less than a week later and seven months before he pleaded guilty.

292 (noting, in denying petitioner's competency-hearing claim, that counsel did not give any indication to the trial court that he doubted petitioner's competence).

Second, Taylor argues that the court erroneously focused on Dr. Sadoff's conclusion of competency, while ignoring portions of the report that indicated incompetency. He also argues that both Mr. Briercheck's and Dr. Sadoff's competency conclusions must be read in the context of their other observations of Taylor's poor mental health. For example, both experts reported Taylor's drug use, suicidal thoughts, acute grief reaction to the killings, and severe depression. It is plain from the face of these reports, however, that both took full account of these issues in reaching their respective conclusions that Taylor was competent. Indeed, as the District Court correctly observed, the Briercheck and Sadoff reports stand in stark contrast to the reports in Drope, which indicated that the defendant would have difficulty assisting in his case and reached no conclusion about whether the defendant was competent to stand trial. 420 U.S. at 164 n.1, 175-76.

Third, notwithstanding the experts' conclusions, we cannot agree with Taylor that his history of drug abuse or suicidal thoughts indicated that he was incompetent to participate in the proceedings. There is no evidence that Taylor was abusing drugs immediately prior to or during the proceedings. See United States v. Renfroe, 825 F.2d 763, 767 (3d Cir. 1987). And his suicide attempt occurred long before the plea and penalty proceedings.[15] Compare

---

[15] In his most recent declaration, Dr. Sadoff states that Taylor's actively suicidal phase persisted for "at least one month," after his discharge from York Hospital. (App. at 378.) This is not inconsistent with Dr. Sadoff's statement in his original declaration that, by September 1991, Taylor was not actively suicidal. Dr. Sadoff noted specifically, before Taylor pleaded guilty, that "[Taylor] was actively suicidal after this happened, and since June 17, when he reached his conversion [he became a Born Again Christian], he has not been suicidal. He talks about having his life in God's hands, and whether or not he gets the death penalty will be up to God." (App. at 322.) Dr. Elyan reached a similar

28

Jermyn, 266 F.3d at 293 (early suicide attempt did not implicate competency *vel non* to stand trial) with Drope, 420 U.S. at 178-80 (mid-trial suicide attempt raised doubt as to competency); United States v. Loyola-Dominguez, 125 F.3d 1315, 1319 (9th Cir. 1997) (suicide attempt on eve of trial raised doubt as to competency); and Tiller v. Esposito, 911 F.2d 575, 578 (11th Cir. 1990) (two suicide attempts while in pre-trial incarceration raised doubt as to competency). Finally, Taylor's desire to confess and receive the death penalty as punishment, and refusal to allow witnesses during the penalty phase, are not indications that he was incompetent. These actions are consistent with Taylor's repeatedly expressed desire to plead guilty and accept the consequences.

Ultimately, the record reveals no indicia that compelled the trial court to hold a competency hearing. As the District Court aptly observed: "Taylor's lucid and remorseful desire to plead guilty simply cannot, out of hand, be colored as utterly bizarre behavior indicative of incompetency." App. at 35 (citing Jermyn, 266 F.3d at 288). We agree with the District Court's analysis in this regard, and are satisfied that the state trial court's decision to forego a competency hearing—before accepting Taylor's guilty plea and through the end of the penalty phase—comported with federal standards of due process.

## 2. Competence To Stand Trial (Claim 2)

Taylor also argues that he was incompetent during his proceedings, in violation of his due process rights. See Drope, 420

conclusion in Taylor's hospital Discharge Summary, in which he stated that by June 28, 1991, Taylor "was not expressing any immediate suicidal plans even though he thought he should have joined his with his family . . . [he] add[ed] that if he was spared then God must have different plans for him, and he seemed to be willing to accept that." (App. at 295.) Mr. Briercheck, too, noted that in 1991 Taylor "den[ied] suicidal ideation, but at the same time [was] asking for the death penalty as punishment for his crimes." (App. at 313.)

U.S. at 171-72; <u>Pate</u>, 383 U.S. at 385. As mentioned previously, to be competent a defendant must have "a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and must possess "a rational as well as factual understanding of the proceedings against him." <u>Dusky</u>, 362 U.S. at 402. We will presume that the state courts' finding that Taylor was competent were correct, unless Taylor can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); <u>Appel</u>, 250 F.3d at 210.

### i. Taylor's After-Acquired Evidence of Incompetence

To rebut the presumption of competence, Taylor seeks an evidentiary hearing before the District Court, in order to present the testimony of four experts: Mr. Briercheck, and Drs. Sadoff, Blair, and Dudley. As indicated in their affidavits, these experts would testify that, contrary to the state courts' competency findings, Taylor was incompetent to plead guilty or to waive his rights. This evidence was not presented to the first PCRA court, which held an evidentiary hearing on Taylor's competency. It was first presented to the state courts in Taylor's second PCRA petition, which the Supreme Court of Pennsylvania dismissed as untimely.

The limits on evidentiary hearings set out in 28 U.S.C. § 2254(e)(2) are relevant here:

> If the applicant has *failed to develop the factual basis of a claim* in State court proceedings, the court *shall not* hold an evidentiary hearing on the claim *unless* the applicant shows that–
>
> > (A) the claim relies on—
> > . . .
> >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence
> > > . . .

<u>Id.</u> (emphasis added). We have explained the meaning of "failed to develop" under § 2254(e)(2) as follows:

> The "failure" inquiry does not end once it is determined that the factual basis of a claim had not been developed in state court. Because "[i]n its customary and preferred sense, 'fail' connotes some omission, fault, or negligence on the part of the person who has failed to do something," "a person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance." Williams, 529 U.S. at 431-32, 120 S. Ct. 1479. Accordingly, "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is *lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel*." Id. at 432, 120 S. Ct. 1479.

Thomas, 428 F.3d at 498 (emphasis added). Thus, if the state courts had failed to resolve the competency issue for some reason unrelated to Taylor's diligence, § 2254(e)(2) would not apply and a new evidentiary hearing would be permitted. See Campbell, 209 F.3d at 286-87.

As the Supreme Court of Pennsylvania explained in Taylor III, however, Taylor had every opportunity to present this evidence of his incompetency at the time of his proceedings, and again at his first PCRA hearing on the issue, nearly six years after the trial: "The issue to which this purportedly newly discovered evidence speaks is whether Appellant was mentally fit at the time of trial. All the facts regarding Appellant's mental state, if not known, surely were ascertainable by the exercise of due diligence before Appellant's trial." 753 A.2d at 786-87. The Court also noted that "regardless of Appellant's [after-acquired evidence] argument, the issue of whether Appellant was competent at trial has been litigated." Id. at 787 n.8.

Taylor argues, nonetheless, that because the second PCRA court declined to hear this evidence based on an inadequate state procedural default rule, it is not his fault that he failed to develop these facts in the state courts. See Wilson v. Beard, 426 F.3d 653,

665 (3d Cir. 2005) ("If a petitioner requests a hearing to develop the record on a claim in state court, and if the state courts . . . deny that request on the basis of an inadequate state ground, the petitioner has not failed to develop the factual basis of [the] claim in State court proceedings for purposes of § 2254(e)(2).") (internal quotation marks omitted). But the problem with an argument based on Wilson is that Taylor's competency claim had been fully litigated well before he sought to have the second PCRA court consider his new evidence. To the extent that the state procedural default of Taylor's claims was inadequate, it only bears on the claims that were new to his second PCRA petition.[16] Unlike the petitioner in Wilson, Taylor's competency claim was raised in his first PCRA petition and addressed on the merits. His resurrection of the claim in his second PCRA petition does not put it under Wilson's rule.

"Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." Williams, 529 U.S. at 437. The only thing that prevented Taylor from presenting his new evidence of incompetency before the first PCRA court was a lack of diligence.[17] Therefore, under § 2254(e)(2), we must affirm the

---

[16] Taylor, in this regard, references the second PCRA court's comment that "if the Defendant's legal arguments were accepted . . . the factual basis that is offered would be sufficient to at least raise a question which would require the testimony [of the new experts] to be heard even though it may not be in the final decision on the merits convincing and may not prevail." (App. at 361.) It is clear from Taylor III, however, that the Supreme Court considered the issue of competency precluded, based on its general observation, independent from the untimeliness of the second PCRA petition, that "the issue of whether Appellant was competent at trial has been litigated." 753 A.2d at 787 n.8. Even if that were not the Supreme Court's view, the fact that there may be a triable issue of fact under state law does not absolve us of our statutory obligation under § 2254(e)(2).

[17] We have doubts about the effectiveness of Taylor's post-conviction counsel, who failed to obtain this evidence—or indeed,

32

District Court's decision to deny an evidentiary hearing on this claim.

### ii. Taylor Has Failed Rebut the Presumption that the State Courts' Competency Determinations Were Correct

As we have explained, both the trial court and the first PCRA court determined as a factual matter that Taylor was competent throughout his proceedings. The Supreme Court of Pennsylvania affirmed these determinations, and they are presumed correct under § 2254(e)(1). Because § 2254(e)(2) bars an evidentiary hearing on Taylor's new evidence of incompetence, he must rely on the present record to rebut the presumption of correctness by clear and convincing evidence. See Lambert, 387 F.3d at 235. In our discussion about the trial court's decision not to hold a competency hearing, however, we explained why the state court record shows no indication that Taylor was incompetent. Taylor therefore cannot rebut the presumption that the state courts' competency determinations were correct.

Moreover, under § 2254(d)'s deferential standard of review, Taylor's claim lacks merit. His competency is amply supported by the state court record—based on, among other things, the original Sadoff and Briercheck reports and the trial court's and trial counsel's interactions with Taylor—and thus the state courts' competency findings constituted a reasonable determination of the facts. See id. ("Section 2254(d)(2) mandates the federal habeas court to assess whether the state court's determination was reasonable or unreasonable given that evidence.").

---

any evidence other than his client's testimony—but ineffectiveness of postconviction counsel is not an exception to § 2254(e)(2)'s requirements. See 28 U.S.C. § 2254(i) (mandating that ineffective assistance of post-conviction counsel is not a ground for habeas relief); Thomas, 428 F.3d at 498 ("[F]ailure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner *or the prisoner's counsel*.") (emphasis added); Coleman, 501 U.S. at 752 (noting no federal constitutional right to post-conviction counsel).

33

Morever, nothing in the record suggests that the competency determinations were "contrary to" the teachings of Drope, Pate, or Dusky. See § 2254(d)(1). Ultimately, "[r]equiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." Godinez, 509 U.S. at 402. Based on our review of the record, we are confident that aim was achieved in Taylor's case. We will therefore affirm the District Court's dismissal of Taylor's claim that he was tried while incompetent.

### 3. Ineffective Assistance with Respect to Competency (Claim 3)

Taylor argues that trial counsel was ineffective for not requesting a competency hearing. We have explained that

> Counsel's failure to request the trial court to order a hearing or evaluation on the issue of the defendant's competency . . . could violate the defendant's right to effective assistance of counsel provided there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and there is a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully considered.

Jermyn, 266 F.3d at 283.

Here, trial counsel testified before the PCRA court, in detail, about his observations of Taylor at the time of the proceedings:

> I did not see anything that [indicated] Paul did not understand the course of conduct that he chose. . . . In what he said or how he behaved or how he acted that would indicate that he didn't understand what was going on. . . . I talked frequently with Pat [Gallagher] at the jail . . . Paul frequently talked to Pat Gallagher, and I received no indication from Pat

Gallagher that Paul Taylor did not understand what was happening. He appeared—everything I saw, Paul was competent to make decisions.

(App. at 270-71.) Consistent with the legal standard for competency, counsel's interactions with Taylor—paired with both the Briercheck and Sadoff reports concluding that Taylor was competent—were sufficient for counsel to reasonably forego a competency hearing.

Nor do we agree with Taylor that counsel unreasonably failed to provide Mr. Briercheck and Dr. Sadoff with enough information for them to make well-informed competency determinations. Mr. Briercheck and Dr. Sadoff state in their new affidavits that they would have benefitted from reading one another's reports,[18] but this retrospective observation does not suggest that it was unreasonable of trial counsel, at the time, to seek two *independent* evaluations. In Jacobs v. Horn, 395 F.3d 92 (3d Cir. 2005), we disapproved of counsel's failure to provide experts with any background information concerning the defendant's history, the alleged crimes, or the Commonwealth's pursuit of the death penalty. Id. at 103. But, in contrast to Jacobs, Taylor's background and crimes are detailed in both Briercheck's and Sadoff's reports. These experts knew a great deal about Taylor's history and the crime, and it is evident from their reports that Taylor discussed the possibility of the death penalty with both of them.

In sum, Taylor's competency-related, ineffective assistance of counsel claim fails on the first prong of Strickland because counsel's decision not to pursue a competency hearing was objectively reasonable, considering all the circumstances. See 466 U.S. at 688. As with the trial court's decision not to convene a competency hearing, there were insufficient indicia of incompetence to deem counsel's decision unreasonable.

---

[18] Sadoff did, however, review Dr. Elyan's report before making his competency determination.

Taylor has also failed to show prejudice under Strickland's second prong. Because we have found that the state courts correctly determined, based on all of the evidence available, that Taylor was competent, there is no "reasonable probability" that Taylor was incompetent, and therefore no prejudice caused by counsel's failure to request a competency hearing.[19] Id. at 694. We will therefore affirm the District Court's dismissal of this claim.

## V. Validity of Taylor's Guilty Plea and Waiver of Specific Defenses (Claim 4); Ineffective Assistance of Counsel Regarding Waivers (Claim 5)

Taylor next argues that his guilty plea, waivers of related rights,[20] and waiver of specific defenses to first degree murder were

---

[19] Taylor argues that his newly-acquired evidence of incompetency shows that trial counsel's investigation was inadequate, and is sufficient to establish prejudice because there is a reasonable probability that his new evidence would result in a finding that he was incompetent. On this basis, he contends, the District Court should have held an evidentiary hearing. Taylor Br. at 37. The problem, again, is that Taylor already had an evidentiary hearing on this issue before the first PCRA court, where he failed to produce Dr. Blair's and Dr. Dudley's evaluations. Cf. Hutchison v. Bell, 303 F.3d 720, 749 (6th Cir. 2002) ("[T]he defendant] did receive an evidentiary hearing on his ineffective assistance of counsel claims in state court. If, as [the defendant] contends, a reasonable investigation would have revealed the evidence discussed above, then it should have been developed in relation to his ineffective assistance claims during his first postconviction proceeding.").

[20] "Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. First, is the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and applicable to the States by reason of the Fourteenth. Second, is the right to trial by jury. Third, is the right to confront one's accusers." Boykin v. Alabama, 395 U.S. 238, 243 (1969) (citations omitted).

not knowing, intelligent, and voluntary. Primarily, he argues that the trial court's inquiry into how his mental state influenced his waivers was inadequate, and he seeks an evidentiary hearing to develop the record on this issue. Taylor Br. at 63.

For the reasons we explain below, however, we fully agree with the District Court that the waiver colloquies in this case, including the written one, made part of the record, were legally sufficient under federal law.[21] See Boykin v. Alabama, 395 U.S. 238, 242-43 (1969).

## A. Standard of Review

Taylor's claim that his guilty plea was not knowing and voluntary was first raised in his second PCRA petition and has never been reviewed on the merits by the state courts. Taylor I does not mention Taylor's last minute decision to withdraw his guilty plea, and although the first PCRA court addressed Taylor's competence to make decisions, it did not address the broader issue of whether his guilty plea was knowing and voluntary. We will therefore review this claim *de novo*, Appel, 250 F.3d at 210, affording the state courts' factual determinations a presumption of correctness, 28 U.S.C. § 2254(e)(1).

## B. Constitutional Requirements for Knowing and Voluntary Waivers

As noted, competence to plead guilty is subject to the same legal standard as competence to stand trial. Godinez, 509 U.S. at 398-99. We have already established that Taylor had the requisite competence to stand trial. However, as the Supreme Court has explained, that is not enough for a valid waiver:

> In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent,

---

[21] This holding does not extend to Taylor's waiver of his state-law right to have a penalty-phase jury, for which there was no on-the-record colloquy. We address this waiver separately, below.

37

> a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. In this sense there is a "heightened" standard for pleading guilty . . . .

Id. at 400-01 (citations and emphasis omitted). Under Boykin, it is crucial that the record reveal not only that a defendant was aware of his rights, but also that he "intelligently and understandingly" waived them. 395 U.S. at 242; see also Johnson v. Zerbst, 304 U.S. 458, 464 (1938) ("[waiver must be] an intentional relinquishment or abandonment of a known right or privilege").

Numerous cases have addressed the basic requirements for a knowing and voluntary waiver, but there are few hard-and-fast rules. We have stated that

> no criminal defendant should plead guilty to a crime unless, and until, he has had explained to him and understands all of his constitutional rights and protections, including the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment, the right to trial by jury, and the right to confront one's accusers.

Hill v. Beyer, 62 F.3d 474, 480 (3d Cir. 1995) (citing Boykin, 395 U.S. at 243); see also United States v. Peppers, 302 F.3d 120, 135 (3d Cir. 2002) (stating that "to be valid [a defendant's] waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter"); but see United States v. Thomas, 357 F.3d 357, 364 (3d Cir. 2004) (describing these same factors as "illustrative examples of factors that courts might discuss, not a mandatory checklist of required topics").

The Supreme Court has explained, further, that the level of detail in the colloquy is not dispositive:

> [T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances-even though the defendant may not know the specific detailed consequences of invoking it. . . . If [the defendant] . . . lacked a full and complete appreciation of all of the consequences flowing from his waiver, it does not defeat the State's showing that the information it provided to him satisfied the constitutional minimum.

Iowa v. Tovar, 541 U.S. 77, 92 (2004) (emphasis, internal quotation marks, and citation omitted). With these guidelines in mind, we review the record of Taylor's waivers.

## C. The State Court Record

In accordance with Pennsylvania law, the trial court first accepted Taylor's guilty plea to homicide generally, and then held a hearing to determine his degree of guilt. Before Taylor pleaded guilty, the court elicited the following:

> MR. EVANICK: . . . I have talked to Paul about this extensively. This is his desire to do this [to plead guilty]. He understands the consequences of what he is doing today. He is also aware of the likely outcome of the further proceedings.
>
> Specifically, he has directed me not to contact any witnesses or to call any medical personnel who have interviewed and talked with him. He understands that there are statutory aggravating circumstances and that the likely result will be the imposition of the death penalty.
>
> THE COURT: You heard the statement of your counsel. Is there anything you wish to add to that at this point?
>
> THE DEFENDANT: No, Your Honor.

39

. . .

(App. at 137-38.)

The court then asked Taylor whether he admitted to each of the murders he was charged with, including the method of each killing. Taylor admitted to committing each one. The court next asked:

> Also you have had the opportunity to review this guilty plea colloquy with your attorney and you filled it out?[22]

---

[22] Evanick assisted Taylor in filling out a "Guilty Plea Colloquy" form. The form is ten pages long, and contains forty-four questions, most of which required Taylor to supply a handwritten answer, which he did. Taylor indicated in the form that he had completed 13 years of education, including "2 yrs of electrical and 3 yrs of electronic" school. (App. at 329.) The form asked, "[i]f you are presently being treated for a mental illness, do you still feel that you can cooperate with your attorney, comprehend what you are doing today, understand what these questions mean and know why you must answer these questions?" Taylor answered "No, Yes." Taylor also affirmed on the form, among numerous other things, that he understood that he was entering a guilty plea (question 15); his attorney had explained all of the elements of the crime (question 16); he admitted doing all of things a person must do to be held guilty of the crimes he was charged with (question 17); he understood the presumption of innocence, and waiver of that presumption (question 18); he understood his absolute right to a trial before a jury to determine his guilt or innocence, and affirmed that he knew of all the rights he had in the course of a trial (questions 19a-19i); he understood he could waive his guilt-phase jury right and have the judge decide his case in its entirety (question 20); he understood that if he pleaded guilty he would be accepting that he was properly charged (question 21) and that his guilty plea would terminate his right to be heard on any challenge the propriety of the charges against him (question 22); he understood his right to be represented by counsel

40

THE DEFENDANT: Yes.

THE COURT: And from discussing the colloquy with him, do you understand your trial rights?

THE DEFENDANT: Yes.

THE COURT: And by pleading guilty you are giving up those rights?

THE DEFENDANT: Yes.

THE COURT: Do you have any questions at all about anything that is happening today or anything that has been involved in this whole process from

---

(question 23); he understood that for first degree murder the court could impose the death penalty, and that lesser sentences were available for lesser degrees of murder and manslaughter (question 25); he was not coerced directly or indirectly to enter the plea (question 35); and he was doing so of his own free will (question 36).

Taylor now argues that any reliance on this form is improper because the form misleadingly suggested that he would not have the opportunity to present witnesses at his degree-of-guilt hearing, and would not be allowed to challenge any trial court errors. Taylor Br. at 49-50 n.24. If the form had misled Taylor by erroneously informing him that his post-plea rights were *more extensive* than they actually were, we agree that the form *might* undermine the validity of Taylor's plea, depending on the remainder of the record. We cannot agree, however, that his choice to plead guilty perhaps thinking that his post-plea rights were *more limited* than they actually were, undermines the validity of his guilty plea. This only shows Taylor would have chosen to plead guilty in spite of these limitations. To the extent that the form's errors may have misled Taylor about his opportunity to present witnesses at the degree-of-guilt phase, we will consider this argument, below.

41

your discussions with your attorney or police or anything that you want to call to the Court's attention at this time?

THE DEFENDANT: No.

THE COURT: Mr. Evanick indicates that you advised him that essentially you don't wish to challenge your guilt in these matters and, in effect, you are telling him to just plead guilty and get it over with and that you will accept the result which he thinks is likely to be the death penalty. Is that a correct statement by you?

THE DEFENDANT: Yes, sir, sort of. Yes.

THE COURT: This would be a good time to add anything you want to add if you want to correct it or change it.

THE DEFENDANT: No. I plead guilty to my charges and I accept it.

THE COURT: What you are saying is whatever happens happens. . . .

And has Mr. Evanick had the opportunity to go over with you the requirements for the charge of criminal homicide, the legality of it telling you what the elements of the offense are and telling you what the Commonwealth would have to prove?

THE DEFENDANT: Yes.

THE COURT: And you are satisfied that you understand what they are?

THE DEFENDANT: Yes.

(App. at 141-43.)

The court then questioned Taylor about whether counsel had gone over with him the Commonwealth's evidence of criminal homicide, and whether Taylor understood that he was pleading guilty to the general charge of homicide, and would later have the opportunity to contest his degree of guilt, but that the death penalty was possible. Taylor responded, "Yes." (App. at 143-44.) Counsel asked the court to advise Taylor in more detail about the specific elements of homicide. The court did, explaining the possible verdicts of first and third degree murder, voluntary manslaughter, and involuntary manslaughter, as well as the difference between murder and manslaughter, along with the elements of the individual offenses. The court asked Taylor whether he had any questions, and then asked him to give a brief statement explaining precisely what happened the night of the killings. Taylor complied, describing the murders in detail, up to the point when he blacked out in the bathtub and found himself in the hospital. The court then accepted the guilty plea "finding it to be knowingly and voluntarily given." (App. at 152.)

Next, at the combined degree-of-guilt and penalty-phase hearing, the court began with argument on Taylor's motion to suppress his hospital statements:

> THE COURT: . . . [A]re you aware that Mr. Evanick thinks there may be some problems in regard to the manner in which the police obtained those statements, that you were not properly advised of your rights prior to giving them?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And if that is correct, the Court would have a hearing and determine whether or not you were properly advised of your rights, and that if the Court found that you were not, it would be possible that the Court would suppress those statements; that is, not permit the Commonwealth to use those statements in evidence against you here today. That possibility exists, is what I'm telling you. Do you understand you have that right?

43

THE DEFENDANT: Yes.

THE COURT: And your attorney's telling me that knowing that you have that right, you choose not to exercise it, that you are telling your attorney, do not file such a suppression motion, let the Commonwealth use whatever evidence they want to use, it doesn't matter to me, I don't want to suppress it?

THE DEFENDANT: Yes.

THE COURT: And you had a sufficient opportunity to talk to Mr. Evanick about that?

THE DEFENDANT: Yes.

(App. at 158-59.)  Before Taylor chose to pursue his suppression motion, however, he confirmed that a victory would not require him to revoke his guilty plea:

THE DEFENDANT: [I]f I lose, they would still use the statement, but if I win, I'd rather go on the road I'm going now, plead guilty for my charges. . . .
. . .
       I'm not dropping and I'm not going to fight it.
. . .
THE COURT: If we have a suppression hearing and I rule in your favor . . . you are saying you still want to leave your guilty plea in?

THE DEFENDANT: Yes.

THE COURT: And you still want to proceed to have your hearing?

THE DEFENDANT: Yes.

(App. at 159-61.)

After the colloquy, the court heard evidence and granted Taylor's suppression motion.[23] The court then reaffirmed Taylor's desire to plead guilty:

I have suppressed the statements at the hospital. Those statements may not be introduced into evidence against you.

Before we proceed, I do want to make sure that you still wish to stand on your guilty plea and proceed with the case. This was only a possibility before. You now know. I have ruled in your favor. I have suppressed those statements and I want to know from you whether you still wish to proceed in the manner that you indicated earlier, whether you still wish to let your guilty plea stand and whether you still wish to proceed with the Degree of Guilt Hearing at this time?

THE DEFENDANT: Yes, proceed with the guilty plea, and go on the same road I'm going now.

(App. at 193-94.)

After the Commonwealth's six witnesses testified in detail about the circumstances surrounding the murders the court announced a recess. As soon as the hearing resumed, defense counsel stated that he had no argument on the degree of guilt, and the court read aloud the elements of first degree murder and found Taylor guilty of the charges.

The first PCRA court credited counsel's testimony that it was Taylor's informed decision not to contest the first-degree murder charge. Counsel stated:

Paul told us about using cocaine before the murders

---

[23] Taylor's June 15 letter of confession contained the same incriminating information as his hospital statement, and was not suppressed.

occurred and during—while the murders were occurring. He mentioned the prior use to Dr. Sadoff. But Paul did not want to exercise any of his rights and testify *or present that defense*.

. . .

[There] was nothing from what Paul was telling us that the cocaine caused him not to understand what he was doing or not to understand that it was wrong.

(App. at 273-75) (emphasis added). The court then found that

*there was discussion with Mr. Evanick about use of both alcohol and drugs and that Mr. Taylor made the decision not to present that testimony or any other testimony*; that Mr. Evanick explained to Mr. Taylor his right to present testimony both by himself *or by witnesses* . . . but that he left it up to Mr. Taylor to make the final decision as to what witnesses would be called; and that Mr. Taylor acting out of remorse and being upset with what had occurred and wishing to receive the death penalty as being the only acceptable atonement for his actions *decided not to call those witnesses and to proceed in the fashion that he did knowing and accepting the fact that it would lead directly to a death penalty.*

(App. at 278.) (emphasis added).

## D. Adequacy of The State Court Record

Taylor argues that his on-the-record waivers were constitutionally deficient because (1) the trial court failed to undertake a "penetrating and comprehensive" inquiry into the impact of Taylor's mental health; (2) the court relied heavily on a pre-printed waiver form; and (3) the court did not discuss the range of punishments allowable for lesser degrees of murder, knowing that there were facts supporting defenses to first degree murder. We address each of these contentions in turn.

First, Taylor argues that the current state court record is

insufficient to judge whether his guilty plea and other waivers were knowing and voluntary. This argument relies largely on the findings contained in new affidavits Taylor has obtained from Mr. Briercheck, Drs. Sadoff, Blair, and Dudley. None of this evidence is part of the state court record and the District Court denied Taylor's request for an evidentiary hearing on the issue.

Because Taylor's "knowing and voluntary" waiver claims were new to his second PCRA petition, which was barred by an inadequate state procedural rule, see *supra*, we cannot say that Taylor, by his own fault, failed to establish the factual basis for this claim under § 2254(e)(2). See Wilson, 426 F.3d at 665. Yet, a petitioner who diligently but unsuccessfully seeks an evidentiary hearing in state court still is not *entitled* to an evidentiary hearing in federal court under AEDPA. Rather, as we explained previously, whether to hold a hearing for a petitioner who is not at fault under § 2254(e)(2) remains in the discretion of the district court, and depends on whether the hearing would "have the potential to advance the petitioner's claim." See Campbell, 209 F.3d at 287.

We will therefore consider whether this after-acquired evidence raises an issue that warrants an evidentiary hearing. In doing so, we review the District Court's decision not to hold a hearing for abuse of discretion. But, we will only consider this evidence to the extent it bears on the knowing and voluntary nature of Taylor's plea—we will not revisit our determination that AEDPA bars a new hearing on competency.

## 1. Updated Briercheck Affidavit

First, Taylor proffers testimony from Mr. Briercheck, who has submitted an updated affidavit. He opines, based on a more recent reevaluation of Taylor and newly available background material, that Taylor's decision to waive his rights was "the result of his grief reaction and his depression." (App. at 383.) This new evidence does not warrant a hearing. The fact that an otherwise competent waiver is the "result" of grief and depression, does not mean that it was not "an intentional relinquishment or abandonment of a known right or privilege." Zerbst, 304 U.S. at

47

464.

Next, Mr. Briercheck suggests that Taylor's psychological disturbances in 1991 make it difficult to determine whether Taylor's waivers were knowing and voluntary by looking only at his statements in court. (App. at 382-83.) Fortunately, as the record currently stands, we have more than Taylor's statements to consider. We also have Briercheck's original, pre-trial report in which he expressed no reservations about Taylor's ability to proceed with the legal aspects of his case. In this report, Mr. Briercheck reached his conclusion despite his contemporaneous finding that Taylor was "struggling psychologically," App. at 317; despite the fact that his "testing did clearly show that [Taylor] was suffering from depression with secondary anxiety features," and a "profound grief reaction," App. at 381 (referring to testing in 1991); despite his diagnosis of "Depressive Disorder with Secondary Anxiety Features;" and despite his recognition that Taylor's "coping skills and defenses [were] extremely taxed," App. at 317.

In short, no evidentiary hearing is needed to evaluate Briercheck's new diagnoses, because his observations before Taylor pleaded guilty reveal the same functional limitations that he noted in his new affidavit. Assuming Taylor was competent, as we have concluded, we are confident on this record that his depression, anxiety, and grief did not undermine the knowing or voluntary nature of his plea.

### 2. Updated Sadoff Affidavit

Second, Taylor proffers testimony from Dr. Sadoff, who also submitted an updated affidavit. In it, Sadoff concluded that Taylor's waivers were the result of his depression, disturbed mental state, and desire to commit suicide. However, like Briercheck's new affidavit, these clinical findings are consistent with Sadoff's findings in 1991—which he does not retract—that *despite* his disturbed mental state and depression, Taylor "kn[ew] the nature and consequences of his current legal situation," and was able to

48

"work with counsel in preparing his defense."[24] (App. at 326.) Sadoff's new affidavit fails to raise an issue about the knowing and voluntary nature of Taylor's waivers because it tells us nothing new about whether Taylor actually and intentionally abandoned his known rights.

### 3. Dudley Affidavit

Third, Taylor proffers testimony from Dr. Dudley, who evaluated him for the first time more than seven years after the guilty plea. Dudley diagnosed Taylor with longstanding Borderline Personality Disorder, and states that "symptoms present in Mr. Taylor's case prevented him from . . . making knowing, intelligent and voluntary waivers of his rights." (App. at 369.) He also indicates that at the time Taylor waived his rights he was suffering from a "Major Depressive Episode." (App. at 368.) Notably, Dr. Dudley states that Taylor's Borderline Personality Disorder caused a psychotic breakdown in 1991 that was well documented by Mr. Briercheck and Drs. Elyan and Sadoff. And we already know, from Briercheck's and Sadoff's 1991 reports, that Taylor's suicidal ideation and depression did not otherwise impair his ability to assist

---

[24] Sadoff's 1991 evaluation of Taylor shows that he appreciated the contours of Taylor's mentally disturbed and suicidal state. In it, he noted Taylor's reports of auditory hallucinations—voices telling Taylor what to do on the night of the murders and for a month after he was admitted to the medical unit in prison. He also reported that he had received and agreed with Dr. Elyan's May 1991 report, which gave Taylor a diagnosis of "acute grief reaction, possible cocaine induced psychosis, and history of cocaine and alcohol abuse." (App. at 325.) And, in his updated affidavit, Sadoff reiterated that at the time he *initially* evaluated him, Taylor "remained severely depressed and continued to suffer from an acute grief reaction." (App. at 378.) In spite of all these issues, Sadoff concluded in 1991 that Taylor was "not actively suicidal at present, and [was] no longer hearing voices," he "appear[ed] to have recovered from the acute situational disturbance that occurred in May 1991," and was "currently mentally competent to proceed." (App. at 326.)

49

counsel and proceed with the legal aspects of his case. The legal conclusions Dr. Dudley reaches based on facts that are already in the record—that Taylor's waivers were not "knowing, intelligent and voluntary"—do not warrant an evidentiary hearing on that issue. See Landrigan, 127 S. Ct. at 1940 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.") (citing Totten v. Merkle, 137 F.3d 1172, 1176 (1998) ("[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.") (emphasis deleted)).

### 4. Blair Affidavit

Fourth, and finally, Taylor offers the expert testimony of Dr. Blair, who also met Taylor for the first time nearly seven years after he pleaded guilty. Like Dr. Dudley, Dr. Blair diagnosed Taylor with longstanding borderline personality disorder. Contrary to Dr. Elyan's, Mr. Briercheck's, and Dr. Sadoff's psychiatric evaluations conducted in 1991, Blair opines that Taylor "remained suicidal throughout the trial proceedings in late 1991 and early 1992." (App. at 374.) In Blair's opinion, Taylor's "waivers were a passive way of committing suicide and were the product of his mental confusion, disorganization and depression rather than rational thinking." (App. at 374.) Blair concludes from these observations that Taylor's waivers were not "voluntary, knowing, and intelligent," but her focus is entirely on Taylor's potentially disordered motivation for seeking the death penalty. Thus, although she uses the terms "knowing and voluntary," the substance of her proposed testimony assesses Taylor's competency—his "ability to understand the proceedings" in 1991—not whether he actually did understand the "significance and consequences" of his decisions and whether they were uncoerced. See Godinez, 509 U.S. at 401 n.12.

In short, Taylor's proffered evidence sheds no new light on whether his plea and other waivers were knowing and voluntary. The District Court's denial of an evidentiary hearing on the knowing and voluntary character of the plea or waivers was

50

therefore not an abuse of discretion.[25]  See Landrigan, 127 S. Ct. at 1940.

### E.  Taylor's Remaining Guilt-Phase Waiver Arguments

Taylor's remaining arguments challenge the validity of his waivers based on the state court record as it currently stands.  First, Taylor argues that the trial court's failure to advise him of his potential defenses to first-degree murder invalidates his plea and waiver of defenses.  Putting aside the fact that Taylor *did* acknowledge his understanding of the range of punishments for lesser degrees of homicide in his written waiver, the record shows that he chose to plead guilty after the court informed him of all lesser degrees of culpability, and the elements that the Commonwealth was required to prove for each.  Moreover, Taylor's discussions with Mr. Briercheck, Dr. Sadoff, his counsel, and the trial court, show that he was well aware that the death penalty was a possible consequence of a first degree murder conviction.

Federal law requires no more detailed colloquy than what Taylor received.  See United States v. Thomas, 389 F.3d 424 (3d Cir. 2004), vacated on other grounds, 545 U.S. 1125 (2005) (stating, in the context of a federal criminal trial, that defendants do not have a right to be "advised of possible defenses, such as voluntary intoxication, during [a] plea colloquy"); United States v. Broce, 488 U.S. 563, 573-74 (1989) ("Relinquishment derives not from any inquiry into a defendant's subjective understanding of the range of potential defenses, but from the admissions necessarily made upon entry of a voluntary plea of guilty"). Where, as here, the defendant fully "understands the nature of the right [being waived]

---

[25]  We are not suggesting that mental health evidence is never relevant to whether a plea is knowing and voluntary, rather, we reach our conclusion, here, because this *particular* mental health evidence—while it uses the words "knowing and voluntary"—is clearly focused on Taylor's competence, and does not raise questions about Taylor's waivers under the standards set in Boykin, Godinez, VonMoltke, or any other relevant federal law.

and how it would apply *in general* in the circumstances," he may knowingly and intelligently waive that right "even though [he] may not know the *specific detailed* consequences of invoking it." Ruiz, 536 U.S. at 629.

Second, though we agree with Taylor that a pre-printed waiver form alone does not satisfy Boykin's requirements, the form here—which Taylor reviewed with the assistance of counsel—was supplemented with an adequate oral colloquy.

Third, considering the first PCRA court's finding that Taylor instructed counsel not to present any testimony at the degree-of-guilt hearing, counsel's in-court statement waiving defenses to first degree murder clearly represented Taylor's knowing and voluntary choice. The record shows that Taylor apprehended the nature of the charges, the statutory offenses included within them, the possibility of the death penalty and "all other facts essential to a broad understanding of the whole matter," yet he repeatedly and clearly insisted on his right to plead guilty and not to present any testimony. See Peppers, 302 F.3d at 135 (internal quotation marks omitted). Because he was competent to make those decisions, his private motivation does not undermine their validity under federal law.

In sum, an evidentiary hearing on the knowing and voluntary character of Taylor's guilty plea and related waivers is not warranted. The current record—including the mental health evidence from 1991—fully supports the District Court's conclusion that Taylor appreciated the significance of his plea, *despite* his depression, grave remorse, and other mental deficiencies. With full information and understanding, Taylor repeatedly and clearly indicated his desire to plead guilty and waive his rights. We will therefore affirm the District Court's decision that these waivers were knowing and voluntary.

## F.  Ineffective Assistance of Counsel: Guilty Plea and Waiver of Related Rights (Claim 5)

Taylor argues, next, that trial counsel was ineffective for failing to ensure that his waivers were knowing and voluntary.

(Taylor Br. at 56-58.) This argument is belied by the record, which shows that trial counsel repeatedly and unambiguously explained to Taylor the consequences of waiving his rights, and that Taylor repeatedly and unambiguously expressed his desire to waive them. Taylor's argument that counsel should not have permitted him to make any decisions because of his incompetence has already been addressed. Based on our review of the record, and adopting the District Court's well-reasoned discussion of this issue, counsel's performance with respect to Taylor's guilty plea was not constitutionally deficient under Strickland, 466 U.S. at 687-88.

## VI. Waiver of Penalty Phase Jury (Claim 6)

Taylor claims that he never knowingly and voluntarily waived his right under 42 Pa. Cons. Stat. Ann. § 9711(b) to have his sentence determined by a jury. The state's failure to follow its own rules of criminal procedure, he argues, violated his Eighth and Fourteenth Amendment due process rights under the federal Constitution. Because this claim has not been addressed on the merits by the state courts we review it *de novo*.

A capital defendant does not have a federal constitutional right to be sentenced by a jury, and states are free to determine whether a judge or jury makes the ultimate sentencing decision. Spaziano v. Florida, 468 U.S. 447, 464-65 (1984). Section 9711(b) of Pennsylvania's death penalty statute provides that

> [i]f the defendant has waived a jury trial or pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose unless waived by the defendant with the consent of the Commonwealth, in which case the trial judge shall hear the evidence and determine the penalty in the same manner as would a jury. . . .

42 Pa. Cons. Stat. Ann. § 9711(b). Under Pennsylvania law, a waiver of rights under § 9711(b) must be on the record and "calculated to insure the defendant comprehends the nature and significance of the right being waived." Commonwealth v. Fears, 836 A.2d 52, 70 (Pa. 2003).

Even assuming the state court failed to follow the law of Pennsylvania, in this federal habeas case, we are limited to deciding whether Taylor's conviction and sentence "violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). It is well established that "a state court's misapplication of its own law does not generally raise a constitutional claim. The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Geschwendt v. Ryan, 967 F.2d 877, 888-89 (3d Cir. 1992) (en banc) (quoted in Johnson v. Rosemeyer, 117 F.3d 104, 109 (3d Cir. 1997)).

Taylor argues that the state court's failure to obtain a knowing and voluntary waiver of his penalty-phase jury right was a federal due process violation under Hicks v. Oklahoma, 447 U.S. 343 (1980). In Hicks, an Oklahoma trial court instructed a jury that if it found the defendant guilty of distributing heroin, it must sentence him to a 40-year term of imprisonment as an habitual offender. Id. at 344-45. But after the trial, the Oklahoma Court of Criminal Appeals declared the mandatory sentencing statute unconstitutional in an unrelated case. Id. at 345. On appeal, Hicks sought to have his 40-year sentence vacated in view of the unconstitutionality of the habitual offender provision. Id. The Court of Criminal Appeals acknowledged that the provision was unconstitutional, but affirmed Hicks's sentence nonetheless, reasoning that since it was within the range of punishment that could have been imposed by a new jury, he had not been prejudiced. Id.

The Supreme Court vacated and remanded the case, explaining that Hicks had a "substantial and legitimate expectation that he w[ould] be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State." Id. at 346 (internal citation omitted). Oklahoma had denied Hicks "the jury sentence to which he was entitled under state law, simply on the frail conjecture that a jury *might* have imposed a sentence equally as harsh as that mandated by the invalid habitual offender

54

provision."[26]  Id.  "Such an arbitrary disregard of the petitioner's right to liberty," the Court held, "is a denial of due process of law." Id.

"Hicks involved an unusual situation which the Supreme Court concluded required due process treatment."  Johnson, 117 F.3d at 113.  Thus, the Supreme Court has not applied Hicks to mean that "every error of state law affecting the outcome of a state criminal proceeding would be cognizable as a due process claim." Id.  If the Court did, "the district courts in habeas cases effectively would become state appellate courts one rung above the state courts of last resort."  Id.  Importantly, in Hicks, the prejudice the defendant suffered because of the state's error heavily influenced the Court's decision:  "[t]he possibility that the jury would have returned a sentence of less than 40 years is . . . substantial," the Court explained, and "therefore, [the state court was] wholly incorrect to say that the petitioner could not have been prejudiced by the instruction requiring the jury to impose a 40-year prison sentence."  447 U.S. at 346.

Accordingly, when considering whether an error under state law implicates due process, "we require more than that the defendant simply be prejudiced . . . .  The standard requires that the defendant be prejudiced in a very particular way."  Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997) (internal quotation marks omitted).  In Smith, we required that "the erroneous jury instructions [must] have operated to lift the burden of proof on an essential element of an offense as defined by state law."  Id.; see also Hill v. Estelle, 653 F.2d 202, 205 (5th Cir. 1981) (holding that error in minimum possible sentence did not implicate Hicks when actual sentence given was large enough to show that error did not prejudice defendant).

Here, we agree with Taylor that we cannot presume, based on a silent record, that he knowingly and voluntarily waived his

---

[26]  Had the members of the jury been correctly instructed in Hicks, they could have imposed any sentence above a minimum of ten years.  See id. (citing Okla.Stat., Tit. 21, § 51(A)(1) (1971)).

state law right to a penalty phase jury.  See Boykin, 395 U.S. at 242; Fears, 836 A.2d at 70.  But we still must determine whether Taylor was prejudiced in a way that implicated his federal constitutional rights.  Cf. Geschwendt, 967 F.2d at 888 (rejecting defendant's claim of prejudice, and finding no federal due process violation even assuming state disregarded its own law).  Critically, Taylor does not argue that having a judge determine his sentence prejudiced him any way that implicates his federal rights.  Indeed, there were substantial strategic reasons not to elect a penalty-phase jury in this case, and Taylor has never asserted that he would have elected one, had he known of the option.  And because Taylor does not suggest that he wanted a penalty-phase jury, he cannot support his ineffective assistance of counsel claim either, because he cannot show prejudice to satisfy Strickland's second prong.  Accordingly, we cannot hold on this record that the alleged state law error violated the Due Process Clause of the federal Constitution.

### VII. Taylor's Penalty-Phase Ineffective Assistance of Counsel Claims and Waiver Claims (Claims 7 and 8)

Taylor's next argument is that trial counsel failed to investigate, present, and argue mitigating evidence at the penalty phase, and his deficient performance prejudiced the defense. (Taylor Br. 76-84.)  Specifically, he argues that counsel failed to: promptly investigate Taylor's mental health; follow up on the Sadoff and Briercheck reports; develop life-history mitigation; develop and present evidence of substance abuse and dependence; or argue for a life sentence based on the mitigating evidence that was already in the record.  Because of counsel's failure to investigate, Taylor argues that his decision not to present mitigation evidence was not knowing and voluntary.

### A.  State Court Proceedings on Counsel's Assistance in the Penalty Phase and Standards of Review

**1.**

At the hearing on his first PCRA petition, Taylor testified

that he had instructed counsel not to present any witnesses at the degree of guilt or penalty phases. He testified, however, that counsel should have taken "all authority and represented me . . . which he did not because he let me decide my fate. And I wasn't really up to deciding nothing because of my—my stress I was under and—and the remorse I had for what I've done." (App. at 254.) He testified, further, that at the time of his proceedings: "I wanted to plead guilty and—but mostly all—I just wanted to take my life." (App. at 256.)

In terms of specific mitigation evidence, Taylor testified that counsel should have called as witnesses "family members, friends, employees, [and] bosses," who could have testified that he had a good home life with his wife and children, but that he also had a drug and alcohol problem. (App. at 254-55.) He admitted that counsel wanted to call some of these witnesses, but that he told counsel: "I didn't want to put them under that pressure because . . . it's a high profile case and I didn't want to put my family through that, you know, whether it be from my family or my wife's family. I didn't want to . . . put them under all this pressure that was brought on." (App. at 261.) When asked whether he had made telephone calls shortly before the hearing and told witnesses not to appear, Taylor replied: "I don't recall that, no." (Id.)

On cross-examination, Taylor admitted that trial counsel wanted the hospital statements suppressed and to go to trial, but that he resisted this advice: "I just wanted to plead guilty and . . . [a]bout that time . . . I started serving God and found God in my life and I wanted to do . . . the right thing and I told him, no, I don't want to go to trial, I'll plead guilty to what I have done. . . ." (App. at 257.) The Commonwealth attorney asked Taylor whether counsel investigated Taylor's mental health issues, and he replied: "The Court . . . brung a psychiatrist to see me and I think Evanick brought one, too, but he never told me the outcome of—of what they said." (App. at 258.)

The court then questioned Taylor about his decision not to present mitigating evidence. Taylor first described how on the night of the murders he consumed alcohol and cocaine, and afterwards, various household poisons in a suicide attempt. Taylor

57

explained that counsel had this information at the time of the guilty plea, but Taylor did not know whether the trial court was aware of it. The court then asked the following:

> THE COURT: Essentially you prevented him from presenting anything that would have caused the death penalty not to be imposed, did you not?
> You instructed him not to call witnesses on your behalf and not to present any evidence that would, is that what you're indicating?
>
> THE DEFENDANT: Yes, because —
>
> THE COURT: And what you are saying today is that you were in a mental state such that you were incapable of making that decision, that Mr. Evanick told you that legally it was your choice and you had the final say, and that you accepted that and you told him not to do it? And you're saying today that was the wrong decision and because of your mental state you weren't capable of making that decision and Mr. Evanick shouldn't have le[t] you make the decision?
>
> THE DEFENDANT: Right.
>
> THE COURT: Does that sum it up?
>
> THE DEFENDANT: Yes, something like that.

(App. at 263-64.)

Trial counsel testified next, and stated that, in his view, Taylor had been competent to make decisions and fully capable of understanding the proceedings. Counsel testified, further, that Taylor was adamant about not presenting witnesses, and even telephoned scheduled witnesses the night before the degree-of-guilt and penalty hearing, telling them not to appear. Counsel stated that he knew "a great deal about Paul's background but Paul wanted none of that presented." (App. at 270.)

58

When asked specifically about Dr. Sadoff's evaluation, counsel explained that it was submitted to the trial judge, but counsel "read the report," which "indicated that Paul was competent and that Paul had no apparent defense." (App. at 272.)[27] Counsel testified that he advised Taylor about Dr. Sadoff's findings, and discussed with him the relevance of his cocaine use: "Paul told us about using cocaine before the murders occurred and during—while the murders were occurring. He mentioned the prior use to Dr. Sadoff. But Paul did not want to exercise any of his rights and testify or present that," either as a defense or in mitigation. (App. at 273.) On cross-examination, counsel reiterated his belief that there "was nothing from what Paul was telling us that the cocaine caused him not to understand what he was doing or not to understand that it was wrong." (App. at 275.)

Based on Taylor's and counsel's testimony, the first PCRA court found the following facts bearing on effectiveness of counsel:

> The Court finds Mr. Taylor's testimony today to be truthful. We believe that it is correct that he instructed Mr. Evanick not to present testimony, that he had discussed the possibility of having testimony by various friends, associates, employers, coworkers with Mr. Evanick and elected not to call them and, in fact, he made the phone calls to tell those witnesses not to come in.

> Also that there was discussion with Mr. Evanick about use of both alcohol and drugs and that Mr. Taylor made the decision not to present that testimony or any other testimony; that Mr. Evanick explained to Mr. Taylor his right to present testimony both by himself or by witnesses and that — but that he left it up to Mr. Taylor to make the final decision as to what witnesses would be called; and that Mr. Taylor acting out of remorse and being upset with what had occurred and wishing to receive

---

[27] We note that the report actually is addressed to counsel.

59

the death penalty as being the only acceptable atonement for his actions decided not to call those witnesses and to proceed in the fashion that he did knowing and accepting the fact that it would lead directly to a death penalty.

. . .

It's clear that counsel has the obligation of explaining these matters to the Defendant and allowing him to make all of these decisions and that they're the decisions of the Defendant not the decisions of counsel.

(App. at 277-78.) The court then concluded that because Taylor was competent to make decisions about his case, and his remorse was not a legal impediment, it was appropriate for counsel to defer to Taylor's wishes.

Taylor II affirmed the first PCRA court's dismissal of Taylor's petition, discussing its prior decisions in Commonwealth v. Morales, 701 A.2d 516 (Pa. 1997), Commonwealth v. Beasley, 678 A.2d 773 (Pa. 1996), and Commonwealth v. Sam, 635 A.2d 603 (Pa. 1993), which held that defense counsel has no duty to introduce and argue evidence of mitigating circumstances where his client has specifically directed otherwise.[28] 718 A.2d at 744-45. Concluding that Taylor's case was indistinguishable from Morales, Beasley, and Sam, the Court explained:

[T]he record in this case clearly supports the PCRA court's findings that Taylor made the decision not to present evidence in the penalty phase and that he did so contrary to the recommendations and advice of trial counsel. In addition to Taylor's having had the benefit of the advice of trial counsel, the

_____

[28] The Supreme Court of Pennsylvania has held that its analysis of ineffective assistance of counsel claims under these cases is identical to Strickland, 466 U.S. 668, and we agreed in Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000).

trial court in various colloquies also advised him of his rights and probed whether his decisions were rational and properly informed. Like trial counsel, the trial court specifically advised Taylor of his right to defend against imposition of the death penalty, including the right to present mitigating circumstances, and that the likely result of the failure to do so would be the imposition of a sentence of death. Under these circumstances, counsel cannot be deemed ineffective for failing to override Taylor's decision not to present such evidence.

Id. at 745.

**2.**

The District Court determined that Taylor's penalty-phase ineffective assistance of counsel claims were not considered on the merits by the state courts. We disagree and will therefore review these claims under § 2254(d). The state court record, which we recounted above, shows that the first PCRA court considered whether Taylor instructed counsel not to present mitigating evidence and whether Taylor was competent to make that decision. See, e.g., App. at 277-80; see also Taylor II, 718 A.2d at 744-45.

The only exception is Taylor's claim that he did not knowingly and voluntarily waive his right to present mitigation evidence. The state courts did not squarely address this issue. Without deciding whether this is truly an independent claim or, rather, an argument that Taylor should have raised when his competence was litigated before the first PCRA court, we will review the question *de novo*. We do so because under either standard of review, the claim lacks merit. See, e.g., Holloway v. Horn, 355 F.3d 707, 719 & n.6, 729 (3d Cir. 2004) (reviewing *de novo* and under AEDPA, noting that result would be the same under either standard).

Moreover, because Taylor sought an evidentiary hearing before the District Court in order to present new mitigating evidence that trial counsel had failed to uncover, we must evaluate Taylor's failure to establish the factual basis for his ineffective assistance claim under § 2254(e)(2). To the extent that the state

61

courts did make factual findings relevant to counsel's assistance, they are binding unless Taylor can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Appel, 250 F.3d at 210.

## B. Federal Standards: Ineffective Assistance of Counsel in the Penalty Phase

We evaluate counsel's assistance in the penalty phase of a death penalty case in light of the fundamental constitutional requirement that the fact-finder render a decision based upon full consideration of available mitigating evidence. Williams, 529 U.S. at 393; Eddings v. Oklahoma, 455 U.S. 104, 110-12 (1982). The "catch-all" provision of Pennsylvania's death penalty statute, 42 Pa. Cons. Stat. Ann. § 9711(e)(8), permits the fact-finder to consider "[a]ny . . . evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense."

To ensure this is a meaningful process, counsel has an "obligation to conduct a thorough investigation" for mitigating evidence. Williams, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)). The investigation must include "efforts to discover *all reasonably available* mitigating evidence," including information about "medical history, educational history, employment and training history, [and] family and social history." Wiggins v. Smith, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, §§ 11.4.1(C), 11.8.6 (1989) (emphasis omitted)); accord Rompilla v. Beard, 545 U.S. 374, 380-81 (2005). We evaluate counsel's investigation under Strickland's reasonableness standard, based on prevailing professional norms, such as those found in the ABA Standards for Criminal Justice. See Outten v. Kearney, 464 F.3d 401, 417 (3d Cir. 2006).

Applying these standards in Wiggins, the Supreme Court held that counsel's decision not to expand his investigation of the defendant's life history beyond the pre-sentence investigation report and Department of Social Services records fell short of

prevailing professional standards. The Court reasoned that prevailing norms of practice as reflected in the 1989 ABA standards were guides to determining what is reasonable, 539 U.S. at 522, and the pre-sentence report and records provided valuable leads that counsel unreasonably ignored: "[A]ny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice," particularly given the absence of prior convictions or other negative information (such as a history of violence) in Wiggins's background. Id. at 525.

Similarly, the Supreme Court held in Rompilla, 545 U.S. 374, that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." Id. at 377. In Rompilla, further effort on counsel's part would have unearthed school, medical, and prison records showing severe psychological deficits and evidence of a highly abusive home life. Id. at 390-93.

The Supreme Court, however, recently distinguished Wiggins and Rompilla, in the situation in which a defendant prevents his attorney from presenting mitigating evidence. See Schriro v. Landrigan, 127 S. Ct. 1933, 1942 (2007). The defendant in Landrigan, Jeffrey Landrigan, was convicted of first degree murder. His counsel had two witnesses prepared to testify at the penalty phase (Landrigan's mother and his ex-wife), but Landrigan asked them not to testify. Id. at 1937. In addition to his instructions to counsel, Landrigan had several outbursts in open court opposing counsel's presentation of mitigation evidence. Id. at 1937-38. For example, when counsel attempted to explain some of the state's aggravating evidence in a more mitigating light, Landrigan verbally attacked counsel, and made comments that made the state's aggravating evidence sound even worse than the state's presentation. Id. at 1938, 1941. When the trial judge asked Landrigan if he had instructed his lawyer not to present mitigating evidence, Landrigan responded affirmatively. Id. at 1941. And when the court asked whether there were mitigating circumstances

63

it should be aware of, Landrigan replied, "Not as far as I'm concerned." Id.

Despite his recalcitrance at trial, Landrigan later filed a federal habeas petition alleging, among other things, ineffective assistance of counsel for failure to investigate and present mitigation. The Supreme Court reversed the Ninth Circuit's grant of habeas relief because (1) the state courts' factual findings that Landrigan instructed counsel not to present any mitigating evidence were reasonable; and (2) the state court reasonably concluded that a defendant who refused to allow the presentation of any mitigating evidence could not establish Strickland prejudice based on his counsel's failure to investigate further. Id. at 1941-42; see also Shelton v. Carroll, 464 F.3d 423, 440 (3d Cir. 2006) (holding that counsel's reliance on defendant's "deliberate and strategic determination that he ought not present mitigating evidence does not rise to the level of unreasonableness under Strickland").

Landrigan also argued that his decision to present mitigating evidence was not informed and knowing. Id. at 1942. The Supreme Court found this claim lacked merit as well, because the Court "ha[s] never imposed an informed and knowing requirement upon a defendant's decision not to introduce evidence." Id. (internal quotation marks omitted).[29]

## C. Taylor's Penalty-Phase Ineffective Assistance of Counsel Claims

---

[29] Even assuming such a requirement, the Court held that Landrigan would not be entitled to relief for three reasons: (1) he had failed to develop the factual basis for this claim in the state courts; (2) the record showed that counsel had "carefully explained" the importance of mitigating evidence and the Court has "never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence" and (3) it was apparent from Landrigan's statements—"if you want to give me the death penalty, just bring it right on. I'm ready for it."—that he clearly understood the consequences of asserting that were no mitigating circumstances. Id. at 1943.

As a threshold matter, we will assume that Taylor's newly proffered mitigation evidence, showing that he was raised in an impoverished, alcoholic, neglectful, perverse, and physically violent home, could have influenced the state trial court to impose life sentences instead of death. Nevertheless, even if the District Court had held a hearing and determined that counsel's failure to uncover this evidence fell below the standards set out in Wiggins and Rompilla, the Court still could not have granted the writ because, under Landrigan, Taylor cannot show Strickland prejudice.

We agree with Taylor that he was not belligerent and obstructive in court like the defendant in Landrigan, 127 S. Ct. at 1944, but the record shows that his determination not to present mitigating evidence was just as strong. Specifically, the first PCRA court reasonably determined that: (1) Taylor refused to allow the presentation of any mitigating evidence, and he called off witnesses that were scheduled to appear; and (2) he was competent to make those decisions. These factual determinations are supported by the record from the first PCRA hearing that we have recounted above, and also by Taylor's and counsel's statements on the record at the guilty plea hearing.[30] See 28 U.S.C. § 2254(d)(2). Thus, whatever counsel could have uncovered, Taylor would not have permitted any witnesses to testify, and was therefore not prejudiced by any inadequacy in counsel's investigation or decision not to present mitigation evidence. See Landrigan, 127 S. Ct. at 1941.

Taylor further attempts to distinguish Landrigan, arguing that, in his case, the first PCRA court made no specific finding that

[30] Without reiterating all of this testimony here, we note that Taylor admitted to the first PCRA court that he instructed counsel not to present any testimony. Morever, the first PCRA court's decision to credit counsel's testimony that Taylor called off witnesses, as well as the court's competency determination, which we have already addressed, were both reasonable, based on the record.

65

he would have prevented presentation of the mental health evidence already available in the Sadoff and Briercheck reports. The record shows, however, that the sentencing court had reviewed the Sadoff report and was aware that Taylor had mental health issues.[31] To the extent supplemental testimony would have been necessary at the penalty phase to elaborate on that report, Taylor's decision not to present witnesses would have prevented it. And to the extent that Taylor's newly obtained mental health evidence (new reports from Mr. Briercheck, Drs. Sadoff, Dudley, and Blair) would have made a difference, Taylor has no cognizable excuse for his failure to present this evidence to the first PCRA court, which heard testimony on Taylor's ineffective assistance of counsel claim. See 28 U.S.C. § 2254(e)(2).

We are also satisfied that Taylor's decision not to present mitigating evidence was informed and knowing. Counsel addressed the trial court and stated that he had discussed with Taylor the likelihood of a death sentence if no mitigating evidence was presented, and Taylor did not disagree that he had been so advised. It is clear from Taylor's many colloquies with the trial court that he understood the consequences of not presenting mitigation evidence. In any event, the Supreme Court stated in Landrigan that it "ha[s] never imposed an informed and knowing requirement upon a defendant's decision not to introduce evidence." 127 S. Ct. at 1942 (internal quotation marks omitted).

For all of these reasons, we will affirm the District Court's denial of an evidentiary hearing on ineffective assistance of counsel at the penalty phase, denial of Taylor's federal habeas claims based on ineffective assistance of counsel at the penalty phase, and denial of his claim challenging the validity of his

---

[31] Dr. Sadoff's original report discusses facts that were potentially mitigating under 42 Pa. Cons. Stat. Ann. § 9711(e)(2) (extreme mental or emotional disturbance) and § 9711(e)(3) (substantially impaired capacity). The trial court was aware from this report that, in one psychiatrist's view, "the killings were a product of [Taylor's] aberrant state of mind," and that "he was responding to his mental disturbance." (App. at 326.)

decision not to present mitigating evidence.

## VIII. Taylor's Remaining Claims (Claims 9, 10 and 11)

We have focused, thus far, on what we view as Taylor's strongest claims. We have also carefully reviewed the record and the briefs with respect to Taylor's three remaining claims: that trial counsel was ineffective for failing to investigate, develop, and present the defenses of diminished capacity and voluntary intoxication (Claims 9 and 10), and that Taylor was denied effective assistance of counsel on direct appeal (Claim 11). We adopt and affirm the District Court's careful analysis of these claims and agree that they are without merit.

## IX. Conclusion

Taylor was competent throughout the proceedings, and knowingly and voluntarily pleaded guilty and waived his trial rights. He then unambiguously instructed his attorney not to present mitigating evidence at the penalty phase because he wanted to receive the death penalty as punishment for his crimes. Because the proceedings in the state courts afforded Taylor an opportunity to exercise all of his Constitutional rights, and otherwise fully comported with federal law, we will affirm the District Court's denial of Taylor's petition in full.